## DAVIDSON v. COMMERCIAL NAT. BANK OF BRADY.
### No. 7820.

Court of Civil Appeals of Texas. Austin.
April 5, 1933.

Rehearing Denied April 26, 1933.

Baker & Baker and Critz & Woodward, all of Coleman, for plaintiff in error.

Cunningham, Moursund, Johnson, Rogers & Slatton, of San Antonio, for defendant in error.

McCLENDON, Chief Justice.

May 14, 1928, Mrs. Davidson (plaintiff below and appellant here) drew a check for $9,000 upon the bank (Commercial National Bank of Brady, defendant below and appellee here), in favor of "Joseph M. Cravens or bearer." This check she delivered to Crothers, the bank's cashier, and it was at once stamped (perforated) "paid," and the amount charged to her account. This suit was brought on September 21, 1931, by Mrs. Davidson against the bank to recover the amount of the check with interest, on two grounds: (1) That the check was procured by false and fraudulent representations of Crothers that Mrs. Davidson was personally liable for certain defalcations of her recently deceased husband, who was in the employ of the bank; and (2) that the check was delivered with the express agreement that it was to be submitted to Cravens for his approval of the transaction, and was not to be cashed without his indorsement; which agreement was not carried out. The bank, in addition to other defenses, pleaded the 2-year statute of limitations (Rev. St. 1925, art. 5526); which plea Mrs. Davidson sought to avoid on the ground that she did not discover the fraud of Crothers until July, 1929, and could not, by the exercise of reasonable diligence, discover it earlier.

The judgment was in favor of the bank upon a special issue verdict, in which all issues submitted were found against Mrs. Davidson, who has appealed from the judgment.

Error is predicated upon objections to the court's charge, the refusal of special issues, the admission and exclusion of evidence, and alleged misconduct of the jury.

We seriously doubt whether any of the issues thus raised presents reversible error; but, since we have reached the conclusion that the record shows conclusively as a matter of law that the cause of action was barred, other questions presented by the appeal are academic, and their discussion will be pretermitted.

As above shown, the suit was filed 3 years, 4 months, and 7 days after all the occurrences had transpired which gave rise to Mrs. Davidson's cause of action. The sole question upon this issue, therefore, is whether the facts, viewed most favorably for Mrs. Davidson, would support a finding that by the exercise of that degree (reasonable) of diligence which the law imposed upon her she could not have discovered the fraud alleged to have been perpetrated upon her prior to September 21, 1929, or 1 year, 4 months, and 7 days after its perpetration.

The material facts upon this issue follow:

Davidson (plaintiff's husband) died March 31, 1928. At that time he and plaintiff had been married upwards of 12 years. They had two children, aged respectively about 11 and 7 years. She was then enceinte and gave birth to a son in August following. Davidson was, and for many years had been, a bookkeeper for the bank. Crothers, the bank's cashier, was a first cousin of Mr. Davidson, and was a friend of both Mr. and Mrs. Davidson. Mr. Davidson's mother, a resident of Madison, Ind., died in 1927, leaving an estate of about $100,000, which she devised in trust, but no part of it, except income, went to Mr. Davidson, Cravens, her brother, a lawyer of 48 years' practice in Indiana, was her executor. He wound up the estate in July, 1929.

Mrs. Davidson's testimony supports her allegations that Crothers advised her that she was personally liable for her husband's defalcations, which were represented at that time to be $9,000. Later, she says, she was told that they amounted to some $50,000. Her testimony also supports her claim that the check was delivered upon the express understanding and agreement that it was not to be cashed until it had been approved and indorsed by Cravens.

Mrs. Davidson testified that she relied upon Crothers' representation as to her personal liability, but for which reliance she would not have delivered the check. This testimony is not reconcilable with the following quotation from her testimony on cross-examination:

"Q. Why did you want that check to go to Madison, Indiana, and be indorsed by Mr. Cravens? A. Because Mr. Crothers was interested in the bank and Mr. Cravens was not interested in the bank and I wanted him to pass on it.

"Q. You wanted somebody else to pass on it? A. I wanted Mr. Cravens to pass on it. It was made out to him.

"Q. You were not satisfied then with what Mr. Crothers told you? A. Well, he had the bank's interest at heart.

"Q. You knew that the bank was going to get the nine thousand dollars, and that their interest was adverse to yours, and that therefore you did not want to trust the bank exclusively? A. Well, I wanted Mr. Cravens to pass on it, because he was a friend of mine too. I wanted his opinion.

"Q. Was he a lawyer? A. I did not know it if he was.

"Q. You just wanted his opinion? A. Yes, sir.

"Q. I thought you said that you went on

what Mr. Crothers said to you? A. I did rely on what he said to me to a certain extent but Mr. Crothers was interested in the bank and Mr. Cravens was a relative.

"Q. You thought it would be better to have Mr. Cravens advise you on it rather than relying exclusively on what Mr. Crothers said? A. Yes, I wanted Mr. Cravens to pass on it.

"Q. Then you did not rely altogether on what Mr. Crothers told you? A. Yes, I had quite a bit of confidence in Mr. Crothers.

"Q. You had quite a bit of confidence in Mr. Crothers, but the question I asked you was, did you rely altogether on what Mr. Crothers told you? A. Well, evidently not.

"Q. You say evidently not? A. Yes, sir."

In addition to this admission on her part, the conclusion that she was not willing to rely upon the representations of Crothers follows necessarily, we think, from her testimony in another place that she made the check payable to Cravens because she was unwilling to make the payment without his sanction and indorsement of the check.

We think the conclusion is also irresistible that she consulted with Cravens, either by letter or personally, regarding paying the bank before she drew the check, or in any event shortly thereafter.

Her testimony upon this point is exceedingly vague, if not in fact evasive. Examples:

"I had correspondence with Uncle Joe about different things."

"I had a lot of correspondence with Mr. Cravens all along and about everything."

"I wrote to Mr. Cravens about a lot of things and do not remember all I wrote him about."

"Q. Is it your testimony that you did or did not write to Mr. Cravens of Madison, Indiana, about this check in the spring of 1929. A. I do not remember my correspondence in 1929 with anyone."

"Q. Did Mr. Cravens write to you and advise you to make this payment prior to the time you did make it? A. I had a lot of letters from J. M. Cravens, but did not pay any attention to them at the time. I was ill and pregnant and I did not pay any attention to anything."

It thus appears from her own testimony that she was in correspondence with Cravens all along, and relied upon him and expected his advice in this matter. It would be most extraordinary for this most important matter to be omitted from the correspondence. Furthermore, she testified she understood the banking custom to require indorsement by the payee of a check, although payable also to bearer, and it is extremely improbable that she would have delivered such a check to the bank to be sent to Cravens for his indorsement, without some explanation from her as to why it was sent and for what purpose his indorsement was sought.

Turning to the testimony of Cravens, introduced by plaintiff, we quote:

"I cannot say that I had anything to do with her making that check. I have answered, and I repeat it here, that I had stated to her that it would probably be better for her to put up a sum out of the proceeds of her insurance money to be used to pay the alleged shortage of her husband when ascertained, believing that thereby and with the application thereon of the Crothers' indebtedness to the Elizabeth G. Davidson estate, the whole shortage and also Will Davidson's indebtedness could be settled, and his good name preserved. I gave this advice to her for that reason, believing the statement made by the Bank officials just prior thereto as to the amount of his shortage. Had I known they were claiming a larger shortage, and that such payments would not pay such shortage, and consequently his name would not be cleared of any alleged shortage, I would not have given such advice. I do not remember, and in fact I do not believe that I gave her any specific directions as to making any check, and in fact did not know that she had made such check until long after the date upon which it was marked 'Paid' had elapsed. * * *

"It is my recollection that either in my letter to Mrs. Rose Davidson, stating that I thought it best for her to put up, out of the proceeds of the Insurance policies, a certain sum of money, and I may have said nine thousand dollars, but I am not certain about the amount, with the bank, out of which to make good said purported shortage, when it was definitely ascertained, as I stated in answer to Interrogatory Number 11, or in some other letter that I wrote to her about that time, that I stated to her that I would give her, out of my personal moneys, $4,000.00, in view of the fact that any payment that she would make out of the insurance money would deplete her resources to such an extent, that it would be difficult for her and her children to live comfortably and properly. I am certain that I did state to her in some letter or letters that I would make such payment out of my moneys to her for such reason and purpose, and I did make such payment to her, for the reason and purpose I have just stated. * * *

"As I have stated in answer to a number of the Direct Interrogatories in this deposition, I did state to her that on account of a payment, or payments to be made to said Commercial National Bank out of the proceeds of her insurance moneys, her resources would be depleted, and that I would give her $4,000, out of my moneys to help her and her children in their living. As I think I have stated in answer to such Direct Interrogatories, I do not now remember the exact date,

as connected with the date of said check, when I made such statement or statements to her, but I think I made some some time in the Spring or early Summer of 1928, and I did make such payment of $4,000 to her for such purpose, and as I then considered it, and as I now consider it, as a gift to her and her children out of my personal moneys."

The record shows that this sum was paid in two checks of $2,000 each, one of which was deposited in the bank by Mrs. Davidson on June 11, 1929.

Mrs. Davidson testified that she first learned that Cravens had not indorsed the check about July, 1930, under the following circumstances: At that time some of the bank employees were arrested for embezzlement; which fact aroused her suspicions, and she then examined the check which had been in her possession ever since about April 1, 1928, when it was returned to her along with her other canceled checks and bank statement.

Upon this point Cravens testified: "I cannot say when was the first time I learned that such check had been issued and charged to the account of Mrs. Davidson on the books of said Commercial National Bank, of Brady, and the amount thereof transferred from her account to the account of said Bank. Some weeks, and it may be some months, after the check was dated, and after the stamp mark thereon indicated that it had been paid, I saw said check, and my recollection is that then and at that time was the first time that I learned about the check, and the other matters inquired about and stated in this cross interrogatory."

However this may be, she did learn shortly after May 14, 1928, that the check was charged to her account. Mrs. Davidson had no further communication with Crothers or any one else connected with the bank regarding the check or the transaction with which it was connected until after July, 1930.

There was no concealment of the alleged fraud from Mrs. Davidson; nor was there any subsequent act or word on the part of Crothers, or any one else connected with the bank, which would excuse her from exercising such diligence to discover the fraud as the law imposed upon her. Her own testimony, above quoted, likewise excludes the existence of such confidential or trust relation as would relieve her of such diligence.

In Connoly v. Hammond, 58 Tex. 11, it was held that neither fraud alone, nor mere ignorance of the fraud, will stop the running of the statute. "There must be both fraud and such concealment that it could not be discovered by the use of reasonable diligence." This holding followed that in Hudson v. Wheeler, 34 Tex. 356, which in turn followed those in a number of earlier Texas cases. It has been frequently reiterated in later Texas

decisions, and is adhered to in many other jurisdictions. See 37 C. J. p. 941, note 8.

A literal application of this rule would prevent any tolling of the statute, where no special circumstances exist which would excuse reasonable diligence. This is the rule's application in some other jurisdictions (37 C. J. p. 491), and also in this state as applied to judgments procured by fraud. Dunn v. Taylor, 42 Tex. Civ. App. 241, 94 S. W. 347, and cases there cited.

But this literal application is not the interpretation applied generally in this state to actions grounded in fraud or deceit. The general interpretation of the rule is that the statute is tolled for a reasonable time allowed to the defrauded party within which to discover the fraud. Stated in a different form, which the opinions quite generally employ, the rule is that the cause of action does not accrue until the fraud is actually discovered, unless, in the meantime, it would have been discovered by the exercise of reasonable diligence. See 20 Tex. Jur. pp. 112, 113, for collation of authorities.

What amounts to reasonable diligence in a given case is ordinarily a fact question; and a variety of circumstances have been held to have evidentiary bearing upon this question. But all agree that, in the absence of concealment, or of confidential or trust relation, or of some subsequent act or word on the part of the defrauder which would tend to lull the defrauded into security and prevent inquiry or investigation, some diligence to discover the fraud is imposed. From this it follows that, where no diligence is shown, the statute ceases to be tolled after a reasonable time has elapsed.

In an action for fraudulent misrepresentation of the quantity of land conveyed, it was held in Bass v. James, 83 Tex. 110, 18 S. W. 336, that where the suit was brought approximately 13 months after the 2-year period had expired, the bar of the statute was complete as a matter of law. The following from the opinion is apropos the present question:

"Appellant relies upon his former confidence in the integrity and veracity of appellee as an excuse in failing to resort to the usual method to ascertain the quantity of land he was buying. He says he had no reason to doubt that such representations as to quantity were true, and he only ascertained that they were false when he had a survey made in October, 1890, in order to ascertain the extent of the right of way of the St. Louis, Arkansas & Texas Railway. More than three years elapsed from the time of making the representations, in October, 1887, to the filing of suit, in November, 1890. It does not appear from the evidence that during this interval appellee made any representations or did anything that was calculated to keep alive the effect produced by the representa-

tions made when he sold the land, or that was calculated to induce appellant not to use reasonable diligence to discover and ascertain the quantity of land contained in the calls of his deed. As said by the court in Kuhlman v. Baker, 50 Tex. 636: 'If the alleged fraud constituted a sufficient reason why appellant did not at the time the sale was made, discover that the quantity was not as represented, his subsequent failure to inform himself of such an important matter as the quantity of land contained in the tract purchased was attributable to his neglect and want of ordinary precaution.' It does not appear that after the sale any intervening representations were made by appellee, as to the quantity of land, that would induce appellant to relax the diligence required of him, as an ordinarily prudent man, to ascertain the quantity of land he actually purchased. If the existence of confidence in the integrity and veracity of the vendor is a sufficient excuse to relieve the vendee from the use of ordinary diligence to discover so important a matter as the quantity of land sold, then this excuse would be effective so long as the confidence continued, and limitation would commence to run, not from the time that the quantity of land could have been discovered by the exercise of ordinary diligence, but from the time the confidence ceased to exist. We do not believe it is the policy of the law that the operation of the statute should depend upon such an uncertain contingency, the happening of which is dependent upon a chapter of accidents. The presumption is, that if the party affected by the fraudulent transaction might, with ordinary care, have seasonably detected it, he seasonably had actual knowledge of it."

If we make every allowance for Mrs. Davidson's mental and physical condition—the shock and grief caused by the recent death of her husband and discovery of his defalcation, the impending advent of her expectant offspring—we think a year after the birth of her child was beyond the extreme limit which the law should accord her within which to discover the fraud, if any degree of diligence whatever on her part is to be imposed.

Conceding the correctness of her statement that she did not know that Cravens had not indorsed the check until July, 1930 (although this statement is in apparent direct conflict with evidence she had previously given that, when she handed the check to Crothers, "he walked right around the counter and stamped it paid without any endorsement whatever"), the fact remains that there was no concealment whatever of Cravens' nonindorsement. On the contrary, the check, which bore conclusive evidence of that fact, had been returned to her by the bank shortly after its delivery, and thereafter continuously remained in her possession. The means therefore, of ascertaining that the check had not been indorsed by Cravens was in her possession. The most cursory examination of the check would have disclosed this fact, and the consequent violation of what she testified was her express agreement with Crothers.

One of the essential elements of actionable fraud is that the false statement must be relied upon by the defrauded party. Mrs. Davidson's quoted testimony shows that her reliance on Crothers' statement that she was personally liable was only to the extent that she believed what he said to be true. She was not willing to rely upon it as a basis for her action. He was representing the bank whose interests were antagonistic to hers, and she wanted and required the advice of Cravens before she would act. That she got Cravens' advice in the matter prior, in any event, to June, 1929, is manifest. Her own testimony on this point is, as above shown, vague and unsatisfactory, if not in fact evasive. She was in correspondence with Cravens both before and after the check was given. Cravens' quoted testimony concludes the matter. Whether he knew of the check before it was given is unimportant. He did advise her and promised to make her a gift of $4,000 if she made the payment. He did subsequently make the gift; one of the covering checks being cashed on June 11, 1929. His testimony shows that he did know, and he must necessarily have known, of the payment prior to that time. Otherwise he would not have sent the money, because Mrs. Davidson's depleted finances consequent upon the $9,000 payment was the motivating cause for the gift. We do not, of course, mean to assert that the record shows that Cravens advised her that she was not personally liable for her husband's defalcations. It does show, however, and conclusively so, we think, that he did advise her in regard to making the payment. Her petition upon which she went to trial alleges that she "had an uncle by marriage, Joseph M. Cravens, of Madison, Indiana, in whom she had confidence and to whom she looked for legal advice in regard to her liability for said debt, and so instructed and advised said bank and its cashier." The gravamen of her suit was the alleged false statement of Crothers as to her legal liability. The record presents no excuse for her failure to submit this all-important question to Cravens, or to seek legal counsel elsewhere.

The pertinent facts upon the issue of reasonable diligence to dicover the fraud, stated, as we have endeavored to state them, most favorably to Mrs. Davidson, and disregarding entirely the evidence of Crothers which presents a direct conflict with that of Mrs. Davidson on every material point, we think bring the case clearly within the rule that, where but one reasonable conclusion can be drawn from the evidence, no fact issue is presented.

The trial court's judgment is affirmed.

Affirmed.